IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JAMES CHARLES FUDGE,

               Plaintiff,

       v.

BRET BENNETT *et al*.,

               Defendants.

Case No. 2:19-cv-01102-SB

**AMENDED[1] FINDINGS AND RECOMMENDATION**

---

**BECKERMAN, U.S. Magistrate Judge.**

      Plaintiff James Charles Fudge ("Fudge"), a self-represented litigant, filed this action against several Oregon Department of Corrections ("ODOC") officials ("Defendants"), alleging various constitutional violations pursuant to 42 U.S.C. § 1983. (ECF No. 2.) Now before the Court is Defendants' motion for partial summary judgment. (ECF No. 107.)

      The Court has jurisdiction over this case pursuant to 28 U.S.C § 1331, but not all parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. For the

---

[1] The Court issues this amended opinion to correct a typographical error. The Court has not made any substantive edits to its original Findings and Recommendation, and the original scheduling order remains in effect. (*See* ECF No. 154.)

reasons that follow, the Court recommends that the district judge grant in part Defendants' motion for partial summary judgment.

## BACKGROUND[2]

On October 28, 2017, Fudge—an adult in custody ("AIC") at Snake River Correctional Institution ("SRCI")—entered the 2F-Unit (the "unit") to watch television. (Compl. at 8, ¶¶ 7-8.)[3] Fudge alerted the second-shift security officer on duty in the unit that no television program was playing, and Fudge was directed to wait and make his request for a channel change to the third-shift security officer, who would be taking over minutes later. (*Id.* ¶ 9.)

Defendant Officer Nancy Armstrong ("Ofc. Armstrong") arrived shortly thereafter and took over for the second-shift security officer. (*Id.* ¶ 10.) Fudge approached Ofc. Armstrong at the officer's station and requested that she change the television channel. (Decl. of Nancy Armstrong in Supp. of Defs.' Mot. for Summ. J. ("Armstrong Decl.") ¶ 5, ECF No. 110.) Ofc. Armstrong denied Fudge's request because he had interrupted Ofc. Armstrong having a "pass down" conversation with the second-shift officer.[4] (*Id.* ¶¶ 5, 8.) Ofc. Armstrong asked Fudge to take a seat until she had completed the pass down. (*Id.* ¶ 8.)

After the second-shift officer left the unit, Ofc. Armstrong called Fudge back to the officer's station to address his request. (*Id.* ¶ 9.) Fudge and Ofc. Armstrong had a verbal altercation. (*Id.*; *see also* Compl. at 9, ¶¶ 11-15.) Sergeant Bret Bennett ("Sgt. Bennett") arrived

---

[2] The following background facts are either undisputed or viewed in the light most favorable to Fudge.

[3] For ease of reference, the Court cites to Fudge's complaint consistent with Fudge's organization of the document.

[4] "A pass down is a shift briefing that occurs when the outgoing officer hands off the post to the incoming officer." (*Id.* ¶ 6.)

at the unit and Ofc. Armstrong informed Sgt. Bennett of her verbal altercation with Fudge. (Decl. of Bret Bennett in Supp. of Defs.' Mot. for Summ. J. ("Bennett Decl.") ¶ 4.) Fudge told Sgt. Bennett that they "need[ed] to talk[,]" and Sgt. Bennett told Fudge they could speak in the hallway, which was behind a "crash gate" that separated the hallway from the unit's day room. (*Id*. ¶¶ 5-6.)

Sgt. Bennett and Fudge went into the hallway. (*Id*. ¶¶ 7-8.) According to Fudge, Ofc. Armstrong closed the crash gate and Sgt. Bennett, along with defendants Officer Carol Buttram ("Ofc. Buttram") and Officer Brenda Brooks ("Ofc. Brooks") were "armed [and] ready to fight[,]" leading Fudge to believe he had been "lured into ambush." (Compl. at 13, ¶ 36.)

Sgt. Bennett informed Fudge that he was going to be "celled-in" because of Fudge's verbal altercation with Ofc. Armstrong. (*Id*. at 14, ¶ 41.) Fudge responded that he had done nothing for which to be celled-in, turned away from Sgt. Bennett, and began walking back toward the closed crash gate. (*Id*. ¶ 42.) Ofc. Armstrong was still inside the unit, and upon seeing Fudge turn toward the crash gate, Ofc. Armstrong backed away from the control panel and armed herself. (*Id*.) Fudge then turned back toward the hall, and alleges he was physically attacked by Sgt. Bennett, Ofc. Buttram, and Ofc. Brooks, and sprayed with a chemical agent. (*Id*. at 14-15, ¶¶ 43-46.)

According to Sgt. Bennett, after initially entering the hallway, Fudge "became very agitated[,] stated 'that fucking bitch disrespected me!'" and was "argumentative" and "disrespectful." (Bennett Decl. ¶ 8.) Sgt. Bennett gave Fudge a verbal order to face the wall and submit to wrist restraints. (*Id*. ¶ 9.) Bennett alleges that Fudge refused, "squared off against staff, taking a step back into the [unit] toward the crash gate looking for [Ofc. Armstrong.]" (*Id*.) Bennett alleges that Fudge then "charged at [Sgt. Bennett] and began throwing closed fist

punches[.]" (*Id*. ¶ 10.) Additional officers arrived, including defendants Officer Fernando Rangel ("Ofc. Rangel"), Lieutenant Jeremy Beaumont ("Lt. Beaumont"), Officer Leslie Cone ("Ofc. Cone"), Officer Gary Durham ("Ofc. Durham"), Officer Kathleen McNulty ("Ofc. McNulty"), and Officer Jose Rodriguez ("Ofc. Rodriguez") (together, Sgt. Bennett and Officers Buttram, Brooks, Rangel, Beaumont, Cone, Durham, McNulty, and Rodriguez are referred to as the "Response Team").[5] (*Id*. ¶ 14; Compl. at 14-16, ¶¶ 43-52.)

In response to this physical altercation, another team of officers arrived, led by Lieutenant William King ("Lt. King"). (Bennett Decl. ¶¶ 15-16.) Lt. King began to "clear actively involved security staff from the incident and replacing them with Special Housing personnel." (*Id*. ¶ 16.) Under Lt. King's supervision, Fudge was escorted to the Disciplinary Segregation Unit ("DSU") by defendants Officer Charles Neal ("Ofc. Neal"), Officer Peter Lettunich ("Ofc. Lettunich"), Officer Daniel Hansen ("Ofc. Hansen"), Officer Chad Moothart ("Ofc. Moothart"), Officer Bobby Carbajal ("Ofc. Carbajal"), Officer Codey Huston ("Ofc. Huston"), and Officer Chad Ford ("Ofc. Ford") (together with Lt. King, the "Escort Team").[6] (Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 11.) Special Housing personnel videotaped Fudge's escort to the DSU.[7] (Bennett Decl. ¶ 17, Ex. 1.)

---

[5] Neither party addresses the role of defendant Officer "Anthony Johnson" in the October 28, 2017, incident. The record reflects that a "Sergeant N. Johnson" was part of the Response Team that secured Fudge prior to the arrival of the Escort Team. (*See, e.g*., Pl.'s Br. in Supp. of Resp. to Mot. for Summ. J. ("Pl.'s Br.") at 57.) The Court assumes that defendant Johnson was a member of the Response Team.

[6] Fudge claims that defendant Officer Joey Olive—promoted to Sergeant after the events alleged in this lawsuit—and Officer Jesse Scott were part of the Escort Team. (Compl. at 17, ¶ 53.) As discussed below, however, the evidence demonstrates that Officer Olive was not on duty at the time Fudge was escorted to the DSU, and there is no evidence in the record demonstrating that Officer Scott was involved in Fudge's escort to the DSU. (*See* Defs.' Mot. at 12.)

[7] The record demonstrates that the video was recorded by Officer S. Brewer, who is not a defendant in this case. (*See* Pl.'s Br. at 62, App'x C-14, Officer Haynes reports that Lt.

The Escort Team eventually placed Fudge in a wheeled restraint chair to complete the escort to the DSU. (*See id*.; *see also* Compl. at 17, ¶ 54.) After intake, Fudge remained in the DSU. (*See* Compl. at 20, ¶ 69.)

## ANALYSIS

### I.   STANDARDS OF REVIEW

#### A.   Summary Judgment

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

"Because plaintiff is proceeding *pro se*, the court construes his pleadings liberally and affords him the benefit of any doubt." *Wilson v. Peters*, No. 2:19-cv-01724-AC, 2020 WL 6437606, at *3 (D. Or. Sept. 25, 2020), *report and recommendation adopted*, 2020 WL 6393901 (D. Or. Nov. 2, 2020) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, "there is no

---

Beaumont stated, "additional Special Housing personnel had arrived to video document the incident" and "Officer S. Brewer activated the video camera and began documenting events"; Pl.'s Br. at 194, Dec. 5, 2017, disciplinary hearing testimony stating, "Officer Brewer, he arrived at Unit 2F with a camera, so he had a video camera[.]").

authority for the proposition that, on motion for summary judgment, that rule operates to lighten the *pro se* litigant's obligation to show a genuine issue of material fact for trial through the presentation of specific, admissible evidence." *Id.* (citation omitted).

### B. Section 1983

Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "To state a claim under [Section] 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Naffe v. Frye*, 789 F.3d 1030, 1035-36 (9th Cir. 2015) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

"A cognizable claim under Section 1983 also requires an [AIC] to show causation; that a particular defendant engaged in "'an affirmative act, participat[ed] in another's affirmative act, or omit[ted] to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Wilson*, 2020 WL 6437606, at *3 (citing *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) and quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

## II. DISCUSSION

Fudge alleges the following claims:

- Grievance Coordinator James Taylor ("Taylor") violated Fudge's First Amendment right to access the courts by denying Fudge's grievances related to the October 28, 2017, incident and subsequent time in the DSU;

- Ofc. Armstrong violated Fudge's Fourteenth Amendment rights by discriminating against him when she refused immediately to change the television channel because of Fudge's race;

- The Response Team violated Fudge's Eighth Amendment rights by using excessive force during the physical altercation in the hallway outside of his unit;

- The Escort Team violated Fudge's Eighth Amendment rights by using excessive force during Fudge's escort to the DSU;

- Sgt. Olive violated Fudge's Eighth Amendment rights was deliberately indifferent to Fudge's serious medical needs by refusing to allow him to take a shower following exposure to a chemical agent; and

- Sgt. Olive violated Fudge's Eighth Amendment rights and was deliberately indifferent to Fudge's serious medical needs by refusing to provide breakfast and lunch to Fudge for the "14-18" days he was in the DSU.

Defendants acknowledge that there are genuine issues of material fact related to Fudge's excessive force claim against the Response Team, and therefore do not move for summary judgment on that claim. (Defs.' Mot. at 3.) Defendants move for summary judgment on all remaining claims, for the following reasons: (1) Taylor did not violate Fudge's constitutional rights by denying Fudge's grievances related to the October 28, 2017, incident because Fudge does not have a right to any specific grievance procedure; (2) Ofc. Armstrong's refusal to change the television channel was based on the timing of Fudge's request, not his race; (3) Ofc. Armstrong and Sgt. Olive could not have used excessive force on Fudge because they were not involved in using any force against Fudge; (4) the Escort Team—whose actions were captured on video—did not use excessive force on Fudge as they transported him to the DSU; and (5) Sgt. Olive could not have been deliberately indifferent to Fudge's needs because Sgt. Olive was not on duty at the time Fudge was allegedly denied a decontamination shower and was not in charge of Fudge's diet in the DSU. (*Id.*)

### III.    GRIEVANCE DENIAL CLAIM

Fudge alleges that Taylor "provide[d] a blanket of protection against wrongdoers" by bringing Fudge's grievances related to the October 28, 2017, incident and subsequent time in the DSU to a "dead end[.]" (Compl. at 20, ¶ 70.) Fudge characterizes Taylor's handling of Fudge's grievances as Taylor acting "with deliberate indifference to abridge, thwart, prevent, and/or deny [Fudge] the administrative process of grievance(s) while setting efforts to deny [Fudge] access to the courts . . . [and] deny[ing Fudge] substantial due process of law." (*Id*. at 21, ¶ 72.) In short, Fudge alleges that Taylor improperly denied his grievances.

Defendants argue that Fudge's claims against Taylor fail as a matter of law because AICs "do not have a 'constitutional entitlement to a specific prison grievance procedure.'" (Defs.' Mot. at 4) (quoting *Fairley v. Shelton*, 664 F. App'x 616, 617 (9th Cir. 2016)).

#### A.    Applicable Law

"[A] prison official's allegedly improper processing of an [AIC's] grievances or appeals, without more, cannot serve as a basis for [S]ection 1983 liability." *Himes v. Taylor-Garcia*, No. 3:20CV0726-JAH-BGS, 2020 WL 4582682, at *2 (S.D. Cal. Aug. 10, 2020) (citing *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003)); *see also Vovos v. Martinez*, No. 221CV0837KJMDMCP, 2021 WL 4078008, at *2 (E.D. Cal. Sept. 8, 2021), *report and recommendation adopted*, 2022 WL 1630804 (E.D. Cal. May 23, 2022) ("[P]risoners have no stand-alone due process rights related to the administrative grievance process." (citing *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988))); *Ramirez*, 334 F.3d at 860 ("[AICs] lack a separate constitutional entitlement to a specific prison grievance procedure.") (citation omitted); *Caudle v. Cal. Dep't of Corr. & Rehab.*, No. 320CV0098JLSLL, 2020 WL 2745229, at *3 (S.D. Cal. May 27, 2020) (dismissing claims against defendants who had allegedly "failed to respond to [the plaintiff's] grievances, failed to adequately address his concerns raised in th[o]se grievances,

or provided an untimely response to his grievances" because "a prison official's allegedly improper processing of an inmate's grievances or appeals, without more, cannot serve as a basis for [S]ection 1983 liability") (citation omitted).

"[AICs] do, however, retain a First Amendment right to petition the government through the prison grievance process . . . [and] interference with the grievance process may, in certain circumstances, implicate the First Amendment." *Vovos*, 2021 WL 4078008, at *2 (citation omitted). "The [First Amendment] right of access to the courts, however, only requires that [AICs] have the capability of bringing challenges to sentences or conditions of confinement." *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 346 (1996)). With respect to an access to courts claim, the AIC "must allege an actual injury." *See Lewis*, 518 U.S. at 349. "'Actual injury' is prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or present a non-frivolous claim." *Vovos*, 2021 WL 4078008, at *2 (citing *Lewis*, 518 U.S. at 349).

### B.     Analysis

Fudge has presented no evidence that Taylor's handling of his grievances "prevented [Fudge] from exercising his First Amendment right to petition for redress or that he sustained an actual injury as a result." *See id.* (dismissing an AIC's claims related to alleged mishandling of his grievances). Fudge believes that Taylor's processing of his grievances gave "wrong-doers" "a blanket of protection[,]" leaving Fudge without an "available process/remedy." (Compl. at 20, ¶ 70.) However, as demonstrated by the present lawsuit, Fudge has not been denied access to the courts, and has sustained no injury resulting from Taylor's processing of his grievances. Further, even had Fudge presented evidence that Taylor handled his grievances improperly, any failure properly to process and address grievances, standing alone, does not support a constitutional claim. *See, e.g.*, *Caudle*, 2020 WL 2745229, at *3 (so holding). For these reasons, the Court

finds that Taylor is entitled to summary judgment on Fudge's claim against Taylor relating to his denial of Fudge's grievances.

## IV.   EQUAL PROTECTION CLAIM

Fudge claims that Ofc. Armstrong violated his Fourteenth Amendment right to equal protection when she refused Fudge's request to change the television channel because of his race. (Compl. at 5; Pl.'s Resp to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") at 3, ECF No. 115.) Defendants argue that Ofc. Armstrong denied Fudge's request because of the timing of the request, not because of Fudge's race. (Defs.' Mot. at 3.)

### A.   Applicable Law

"To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show [either] that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class[,]" or that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (intentional discrimination); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (different treatment).

"[T]o the extent [a p]laintiff seeks to allege an equal protection violation based on discrimination, a § 1983 plaintiff alleging such a violation must prove that: '(1) the defendants treated [the plaintiff] differently from others similarly situated; (2) this unequal treatment was based on an impermissible classification; (3) the defendants acted with discriminatory intent in applying this classification; and (4) plaintiffs suffered injury as a result of the discriminatory classification." *Cervantes v. Defendant*, No. 2:20-cv-00105-AC, 2020 WL 1531130, at *2 (D. Or. Mar. 31, 2020) (quoting *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1137 (E.D. Cal.

2004)); *Salmon v. Ventura*, No. 2:19-cv-01878-AC, 2021 WL 2879285, at *5 (D. Or. Feb. 8, 2021) (same).

## B. Analysis

Fudge alleges that the reason Ofc. Armstrong refused to change the television channel for him upon request was because of his race.[8] The record reflects that when Fudge initially approached Ofc. Armstrong to request a television channel change, she was in the process of handling a pass down with another officer. (Armstrong Decl. ¶ 5.) According to Defendants, it is important for security and safety that officers conducting pass downs do so confidentially and without interruption. (*Id*. ¶ 7.) Accordingly, Ofc. Armstrong told Fudge to "take a seat until [she] was done talking . . . and the pass down was complete[.]" (*Id*. ¶ 8.) After concluding the pass down, Ofc. Armstrong called Fudge back and he asked her again to change the television channel. (*Id*. ¶ 9). Ofc. Armstrong claims she informed Fudge that she would "check the television channels for him once [she] had everything in order for the shift[.]" (*Id*.) Ofc. Armstrong's refusal to change the channel resulted in a verbal altercation with Fudge. (*Id*.)

According to Fudge, he was instructed by the second-shift officer to wait until Ofc. Armstrong came on shift to request the channel change. (Compl. at 8, ¶ 8.) Once Ofc. Armstrong arrived to relieve the second-shift officer Fudge approached Ofc. Armstrong at the officer's station and "stood silently awaiting [Ofc. Armstrong's] acknowledgement, to present request for a television channel station change." (*Id*. at 8, ¶ 10.) Ofc. Armstrong acknowledged Fudge with "a disgusting rude tone of speech" and asked him, "what do you want?" (*Id*. at 9, ¶ 11.) Fudge alleges he "calmly presented a[n] oral-verbal request," and in response, Ofc. Armstrong

---

[8] Defendants acknowledge that Fudge is a member of a protected class due to his race. (Defs.' Mot. at 7.)

"exploded" and ordered Fudge to go to the rear of the day room and not to return to the officer's station unless called. (*Id*. at 9, ¶¶ 12-14.) Fudge complied. (*Id*. at 10, ¶ 18.) Shortly thereafter, Ofc. Armstrong called Fudge back to the officer's station and apologized to Fudge, saying she "didn't intend to speak to [Fudge] rudely or disrespectfully." (*Id*. at 10, ¶ 20.) Fudge acknowledges that Ofc. Armstrong told him that "when you see two or more officers up here in this front panel control area, you don't come up here, you stay away, you wait until there is only one officer in this unit or behind the control panel, your job is to wait, you wait until other staff leave." (*Id*. at 10, ¶ 22.)

Defendants argue, *inter alia*, that Fudge "does not allege any facts that demonstrate that he was treated differently from others similarly situated." (Defs.' Mot. at 7.) Defendants point to the timing of Fudge's request as the reason Ofc. Armstrong could not immediately accommodate his request, arguing that "[Fudge] interrupted a shift change . . . and [Ofc.] Armstrong asked him to wait while the officers completed the pass down and she got everything in order for her shift for security reasons." (*Id*.)

With respect to whether Ofc. Armstrong treated other similarly-situated AICs differently, Fudge alleges that Ofc. Armstrong would change the television channel for "white male [AICs] whom followed the same procedure in requesting a channel station change" and would also "issue the [television] remote control device to white male [AICs]" to select a television station on their own, while denying black AICs' requests for channel changes and not issuing black AICs the remote control.[9] (Compl. at 5.) Notably, Fudge does not allege that Ofc. Armstrong

---

[9] Although Fudge asserts these allegations in his complaint, his complaint is verified. (*See* Compl. at 6, ¶ VI, verifying "under penalty of perjury . . . that the above and foregoing is true and correct to the best of my knowledge and belief"). "A verified complaint may be used as an opposing affidavit under Rule 56." *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (citation omitted). "To function as an opposing affidavit, however, the verified complaint must

granted television channel change requests from other AICs on the day or time in question, or at other times during a pass down. That distinction is important because Ofc. Armstrong explained that the timing of the request during the pass down is what prevented her from accommodating Fudge's request. *See Salmon*, 2021 WL 2879285, at *6 ("Similarly situated inmates 'must be similar in the respects pertinent to the state's policy.'" (quoting *Holestine v. R.J. Donovan Corr. Fac.*, No. 18-CV-2094-AJB(WVG), 2020 WL 4218498, at *5 (S.D. Cal. July 23, 2020) and *Taylor v. San Diego Cnty.*, 800 F.3d 1164, 1169 (9th Cir. 2015))). Thus, the allegations in Fudge's complaint regarding Ofc. Armstrong sometimes changing the television channel for other AICs is insufficient to create a triable issue of fact as to whether she treated similarly-situated individuals differently than Fudge with respect to asking him to wait for a television channel change until after the pass down was complete.

Fudge responds by claiming, for the first time in his response, that "a second before" he requested the television channel change, "Caucasian AICs made request[s] for I-tablets, cards and chess pieces" and "[Ofc.] Armstrong issued those request[s.]" (Pl.'s Resp. at 3.) However, Fudge presents no evidence or sworn testimony in support of this new allegation in his response to Defendants' motion. *See Wasco Products, Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings."). In any event, there is no evidence in the record that Ofc. Armstrong accommodated other AIC requests to change the television channel during a pass down, either on the day in question or any other day. *See Salmon*, 2021 WL 2879285, at *6 (holding that the

---

be based on personal knowledge and set forth specific facts admissible in evidence." *Id.* (citations omitted). Here, as in *Schroeder*, Fudge's allegations are based on his personal knowledge. (*See* Compl. at 5, stating "Fudge . . . observed [Ofc.] Armstrong . . . discriminate [against] black male inmates"; *see also* Compl. at 8, ¶ 7, stating "[Fudge] observed [Ofc.] Armstrong's pattern of conduct immediately at the start of the shift").

plaintiff "fails to allege facts supporting that he was treated differently from similarly situated inmates" and noting that "the level of similarity between plaintiff and the persons with whom they compare themselves must be extremely high" (quoting *Ireland v. Solano Cnty.*, No. 2:19-cv-1104-KJM-EFB P, 2020 WL 2770062, at *4 (E.D. Cal. May 28, 2020))).

Based on the record before the Court, no reasonable juror could conclude that Armstrong, by failing to change the television channel at Fudge's request during a pass down, treated Fudge differently from other similarly-situated AICs based on his race.[10] Accordingly, the Court finds that Ofc. Armstrong is entitled to summary judgment on Fudge's Fourteenth Amendment claim.[11]

## V.    EXCESSIVE FORCE CLAIMS

### A.    Applicable Law

The Eighth Amendment establishes a constitutional protection from "cruel and unusual punishment[.]" U.S. CONST. AMEND. VIII. "When prison officials use excessive force against prisoners," they violate that right. *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). However, "[f]orce does not amount to a constitutional violation in this respect if it is applied in a

---

[10] In contrast to Fudge's current allegations of race discrimination, Fudge testified at his December 4, 2017, disciplinary hearing that he believed "the catalyst" for the verbal altercation with Ofc. Armstrong was because SRCI staff were aware that Fudge "assaults women" and "kill[ed] his wife" and therefore Ofc. Armstrong was scared of him. (Pl.'s Br. at 200, App'x E-43.) Fudge later testified, "I understand [Ofc. Armstrong] feeling disgusted because subordinates have told her that I killed my wife and I've assaulted female officers and they've basically made this lady scared of me for no reason[.]" (*Id*. at 200, 204, App'x E-47.)

[11] Even if Fudge could present evidence to create a triable issue of fact as to whether Ofc. Armstrong treated him differently than similarly-situated individuals, Fudge has not alleged or demonstrated that he suffered any injury as a result of Ofc. Armstrong's delay in changing the television channel. *See Reyes v. Washburn*, No. 2:19-cv-01562-AC, 2020 WL 129084, at *2 (D. Or. Jan. 8, 2020) (finding a plaintiff must prove four elements to establish an equal protection violation based on discrimination, including that "plaintiff suffered injury as a result of the discriminatory classification").

good faith effort to restore discipline and order and not 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). A claim under the Eighth Amendment requires a more culpable mental state "than that required for excessive force claims arising under the Fourth Amendment's unreasonable seizures restriction." *Id.* (citation omitted). Courts look to whether there was "malicious and sadistic force, not merely objectively unreasonable force." *Id.*; *see also Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (recognizing that "the Supreme Court established that government officials violate the Eighth Amendment when they use malicious and sadistic force in the course of quelling a prison disturbance, even one that 'indisputably poses significant risks to the safety of inmates and prison staff'" (quoting *Whitley*, 475 U.S. at 320-21)).

Therefore, "[t]o prevail on his excessive force claim, [Fudge] must show that (1) the defendants used force against [him]; (2) the use of such force was excessive and applied maliciously and sadistically for the very purpose of causing [him] harm and not in a good faith effort to achieve a legitimate purpose; and (3) [he] suffered harm as a direct result of this use of force." *Hackworth v. Rangel*, No. 106CV0850AWIYNPSMSPC, 2009 WL 3211003, at *4 (E.D. Cal. Sept. 30, 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)).

## B.    Analysis

### 1.    Ofc. Armstrong

Fudge does not allege that Ofc. Armstrong directly used physical force against him. Rather, Fudge claims that Ofc. Armstrong violated his rights when she "command[ed] the removal of [Fudge] from her unit by force[.]" (Compl. at 21, ¶ 74.) Defendants argue that Ofc. Armstrong is entitled to summary judgment on Fudge's excessive force claim because it is undisputed that Ofc. Armstrong "did not direct or participate in any use of force against" Fudge. (Defs.' Mot. at 8.)

The record before the Court demonstrates that in the hallway outside of the unit, Sgt. Bennett told Fudge to "face the wall and submit to wrist restraints." (Bennett Decl. ¶¶ 8-9.) In response, Fudge turned back toward the unit's crash gate and observed Ofc. Armstrong "back[] away from the officer's control panel to arm herself." (Compl. at 14, ¶ 42; *see also id*. at 25, Ex. 4, Ofc. Armstrong states, "I spotted a reflection of [Fudge] backing into the [u]nit shouting at staff. As I prepared to defend myself from [Fudge] he lunged and attacked [Sgt. Bennett and] I turned my attention to my housing unit and began securing my day room to avoid any other inmate issues"). Fudge does not allege that Ofc. Armstrong directly used any force on him during the incident. At most, Fudge alleges that he heard Sgt. Bennett command either Ofc. Armstrong or Ofc. Buttram to pull Fudge's "finger out of Bennett's eye socket" but there is no corresponding allegation or evidence demonstrating that Ofc. Armstrong did so. (*See* Compl. at 15, ¶ 47; *see also* Pl.'s Br. at 144, App'x D-55, Fudge Decl., Mar. 22, 2018, statement that Fudge "heard Bennett command [Ofc.] Armstrong to become physically involved in the use of excessive force to pull Fudge's hand, fingers and wrist").

"[A]n excessive force claim requires the actual use of 'force[.]'" *Burns v. Decarr*, No. 07-CV-1984-JLS (WMC), 2010 WL 744395, at *3 (S.D. Cal. Mar. 2, 2010) (granting summary judgment on excessive force claim where the plaintiff admitted that the defendant "never 'put his hands on' [the p]laintiff" (citing *Clement*, 298 F.3d at 903)); *see also Hassan v. Weidenfeld*, No. C11-2026-JCC, 2013 WL 4094838, at *8 (W.D. Wash. Aug. 13, 2013) (granting summary judgment for the defendant on an excessive force claim where the plaintiff's allegation was insufficient to "contradict [the defendant's] sworn declaration that he . . . never touched [the plaintiff]"); *see also Meas v. City & Cnty. of San Francisco*, 681 F. Supp. 2d 1128, 1137 (N.D. Cal. 2010) (granting summary judgment for the defendant on excessive force claim where the

plaintiff testified both that the defendant "did not touch him, [and] that he didn't know whether [the defendant] touched him").

Based on the record before the Court, no reasonable juror could find that Ofc. Armstrong used any force on Fudge, let alone excessive force, and Ofc. Armstrong is entitled to summary judgment on Fudge's excessive force claim.

### 2.    Sgt. Olive

Fudge's complaint identifies Sgt. Olive as a member of the Escort Team, and specifically alleges that Sgt. Olive "struck [Fudge] atop [sic] of his hooded head, on the floor, [and] blows were plummeted [sic] from around the exposed areas of [Fudge's] body[.]" (Compl. at 17, ¶ 55). Defendants argue that Sgt. Olive is entitled to summary judgment on Fudge's excessive force claim because Sgt. Olive's shift had ended and he had already left for the day before the incident. (Defs.' Mot. at 8.)

The record demonstrates that on October 28, 2017, Sgt. Olive worked the "second shift" in the DSU, which starts at 6:00 a.m. and ends at 2:30 p.m. (Decl. of Joey Olive in Supp. of Defs.' Mot. for Summ. J. ("Olive Decl.") ¶ 4; Ex. 1, ECF No. 109.) Fudge does not allege that any physical altercation occurred on that day until "approximately 3:15 p.m." (Compl. at 12, ¶ 31.) Therefore, it is undisputed that Sgt. Olive's shift ended approximately one hour before any physical altercation with Fudge occurred.

Fudge nevertheless claimed in a January 1, 2018, grievance form that at "about 3:40 p.m." "Officer J. Olive put his booted-foot on the rear of my head [and] as I . . . lie on the floor in hand and leg irons . . . brutal kicks[,] st[o]mps[,] and punches were delivered to my head, back, neck by Officer J. Olive[.]" (Pl.'s Br. at 74, App'x C-26.) Despite Fudge's claim, there is no other mention in the record before the Court that Sgt. Olive was present or involved in the October 28, 2017, incident giving rise to Fudge's excessive force claim. Specifically, neither the

other involved officers' incident reports nor the testimony from Fudge's December 5, 2017, SRCI disciplinary hearing detailing the involvement of each officer in the October 18, 2017, incident mention Sgt. Olive. (*See generally* Pl.'s Br. at 174-216, App'x E-17.)

In light of the evidence that Sgt. Olive's shift had ended before the incident and no evidence in the record supports Fudge's allegation that it was Sgt. Olive who assaulted him, the Court finds that no reasonable juror could find that Sgt. Olive was present during any use of force against Fudge and therefore Sgt. Olive is entitled to summary judgment on Fudge's excessive force claim.[12]

### 3. The Escort Team

Defendants argue that the Escort Team is entitled to summary judgment on Fudge's excessive force claim because "their actions—captured on video—were not excessive." (Defs.' Mot. at 3.)

The Court has reviewed the video evidence of the Escort Team escorting Fudge from the hallway outside the unit to the DSU. The sixteen minute, twenty-three second, video captures the Escort Team's interactions with Fudge (but not the Response Team's interactions with Fudge, which are not at issue in the present motion).

As the Escort Team arrives to the hallway where the physical altercation with the Response Team was ongoing, Fudge is observed on the ground with multiple officers attempting to restrain him. At 0:48, Lt. King identifies himself to Fudge and informs Fudge that he is going to be escorted to the DSU. When asked by Lt. King if he understands, Fudge replies "yes." Lt. King informs Fudge that any sudden movements will be seen as a sign of aggression. The

---

[12] In any event, as discussed below, because the Court finds that no reasonable juror could conclude that any member of the Escort Team used excessive force during Fudge's escort to the DSU, even had Sgt. Olive been present, he would be entitled to summary judgment.

officers attempt to get Fudge up to his feet, but he appears unwilling or unable to walk.[13] At 1:27, Fudge drops to the ground and officers restrain him on the ground. At 1:54, Lt. King tells Fudge "you will walk" and asks if Fudge understands, Fudge replies "yes" and stands up to walk.

At 3:13, Fudge drops toward the ground suddenly and officers restrain Fudge on the ground. The officer taking the video states "inmate just tried to turn on staff, placed on the ground again to control his erratic behavior, he's trying to kick staff." At 3:43, officers stand Fudge up and he is instructed to "keep your feet moving." At 4:10, Fudge again drops to the ground and is restrained, and at 4:48 the Escort Team places Fudge in a wheeled restraint chair for the remainder of the escort. Fudge arrives at DSU intake at 8:37, staff take photographs of Fudge, and ODOC medical staff attends to Fudge at 10:54 before continuing the intake process.

In sum, the video evidence shows that the Escort Team escorted Fudge from his unit to the DSU, restrained him each time he dropped to the ground, and eventually placed him in a wheeled restraint chair to complete the transfer to the DSU. Even viewing this evidence in the light most favorable to Fudge, the Court finds that no reasonable juror could find that the force used by members of the Escort Team was sadistic or malicious, and therefore the Escort Team defendants are entitled to summary judgment on Fudge's excessive force claim.

## VI. DELIBERATE INDIFFERENCE CLAIMS

Fudge alleges that Sgt. Olive violated his Eighth Amendment rights when, despite Fudge being exposed to a chemical agent, Sgt. Olive refused to allow Fudge to take "a decontamination shower prior to strip cell [sic] DSU housing." (Compl. at 20, ¶ 69.) Fudge further alleges that Sgt. Olive "refus[ed] to feed [Fudge] breakfast and lunch meals forcing one (1) meal per day

---

[13] Fudge does not allege that he was unable to stand or walk at this time as a result of his injuries.

'crash diet' . . . for the next [fourteen to eighteen] days" while Fudge was in the DSU following the October 28, 2017, incident. (*Id.*)

### A. Applicable Law

To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate that the defendant was deliberately indifferent to his serious medical needs or conditions of confinement. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (serious medical needs); *Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014) (conditions of confinement). To satisfy the subjective component of the Ninth Circuit's deliberate indifference test, the plaintiff must demonstrate that the defendant knew of and disregarded an excessive risk to the plaintiff's health and safety. *See Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)).

### B. Analysis

#### 1. Shower Denial

Defendants argue that Sgt. Olive is entitled to summary judgment on Fudge's claim related to a decontamination shower "because Sgt. Olive was not on duty between the time that [Fudge] was subject to [Oleoresin capsicum ("OC")] spray at 3:48 p.m. on October 28, 20[17],[14] and the time that [Fudge] took a shower at 8:12 p.m. that day." (Defs.' Mot. at 10.)

The Court recognizes that failure to provide a decontamination shower to an AIC who has been exposed to OC spray can form the basis of an Eighth Amendment claim. *See, e.g.*, *Walsh v. Gower*, No. 2:18-CV-00098-HZ, 2020 WL 1149912, at *5 (D. Or. Mar. 9, 2020) (holding that qualified immunity did not apply to the defendants' refusal to provide a shower to

---

[14] Defendants state in their motion that Fudge was subject to OC spray on October 28, 2021, but this appears to be a scrivener's error.

an AIC because "a reasonable officer in [d]efendants' position would understand that it was

unlawful to ignore [an adult in custody's] complaints of pain and deny [the adult in custody] the

opportunity to decontaminate after secondary exposure to [OC] spray"). However, and as

previously explained, the record reflects that on October 28, 2017, Sgt. Olive's shift ended at

2:30 p.m. and he was no longer working when the altercation between Fudge and SRCI officers

occurred. (Olive Decl. ¶ 4; Ex. 1.)

Fudge responds by claiming that there remains a genuine issue of material fact regarding

whether Sgt. Olive was present because "that is [Sgt.] Olive's voice on the recorded videotape

[saying] 'Fudge, welcome back to DSU buddy[.]'" (Pl.'s Resp. at 12, ¶ 2.) An officer does make

such a statement at 0:28 in the video. However, the record reflects that the statement was made

by Lt. King, not Sgt. Olive. (*See Bennett* Decl., Ex. 2, a corrective action memorandum from

"Capt. M. Turner" to "Mr. Bell, Assistant Superintendent of Security" states that "Lieutenant W.

King responded [to the incident with Fudge] . . . [he] began directing the team . . . [and] was

recorded on the video saying to [AIC] Fudge "Mr. Fudge, welcome back to DSU buddy" and

reflects that Lt. King was "verbally counseled" because his comment "was not de-escalating the

incident").

In any event, Fudge does not allege that he suffered any injury resulting from the lack of

a decontamination shower, nor that he informed anyone of any injury related to the use of OC

spray such that Sgt. Olive—or any defendant—had the subjective knowledge of a serious

medical need necessary to support an Eighth Amendment claim. *See Colwell*, 763 F.3d at 1066

("A prison official is deliberately indifferent under the subjective element of the test only if the

official knows of and disregards an excessive risk to inmate health and safety.") (simplified).

Rather, the record, which Fudge does not appear to dispute, demonstrates that after the escort to

the DSU and completion of the intake process, "Fudge was allowed to utilize the restroom within Special Housing . . . [and] due to the minimum amount of chemical agent that [Fudge] had come into contact with[,] the decontamination process was adjusted and at 6:48 p.m., under [Lt.] King's direction [Fudge] was escorted to the medical infirmary . . . [and] was afforded the opportunity to shower but declined." (Bennett Decl., Ex 2, at 23-24, excerpt from "Unusual Incident Report" drafted by Lt. Beaumont).

On this record, no reasonable juror could conclude that Sgt. Olive violated Fudge's rights by not providing him a decontamination shower and therefore Sgt. Olive is entitled to summary judgment on Fudge's deliberate indifference claim.

### 2.    DSU Meals

Defendants argue that Sgt. Olive is entitled to summary judgment on Fudge's claim that Sgt. Olive deliberately withheld several meals from Fudge while housed in the DSU because Sgt. Olive was "only on duty for [eleven] of those [fourteen to eighteen] days in DSU[,]" did not issue any meal restrictions against Fudge, and because "it is the responsibility of the AICs on DSU to be fully dressed and standing near their cell doors in order to receive their meals." (Defs.' Mot. at 10.) Fudge responds that a genuine issue of fact remains because Sgt. Olive exercised his own discretion in refusing to provide breakfast and lunch to Fudge while he was in the DSU. (Pl.'s Resp. at 5, ¶ 8(c).)

"[I]t is clearly established under the Eighth Amendment that prison officials are obligated to provide inmates with nutritionally adequate meals on a regular basis." *Foster v. Runnels*, 554 F.3d 807, 810 (9th Cir. 2009). "[T]he 'repeated and unjustified failure' to provide inmates adequate sustenance 'amounts to a serious depr[i]vation' in violation of the Eighth Amendment." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1259 (9th Cir. 2016) (citing *Foster*, 554 F.3d at 814.) Further, "[t]he risk that an inmate might suffer harm as a result of the repeated denial of

meals is . . . 'sufficiently obvious' to create a question of fact as to whether [a defendant] displayed deliberate indifference to a substantial risk of harm." *Foster*, 554 F.3 at 810 (citation omitted).

Fudge alleges that Sgt. Olive denied him "breakfast and lunch meals forcing [a] one meal per day 'crash diet' . . . [for] 14-18 days." (Compl. at 20, ¶ 69.) While the alleged deprivation of meals was ongoing, Fudge filed a grievance form on November 10, 2017, stating that "DSU Officer Olive has [sic] made it his personal reprisal to not feed me breakfast and lunch[.]" (Pl.'s Br. at 67, App'x C-19.) The grievance response indicates that the reviewing officer would report Fudge's complaint to a Captain, but "I am not finding any [meal] restrictions on you." (*Id*.) For his part, Sgt. Olive now states that he has "no recollection of AIC Fudge's meals during the time period he was in DSU . . . [b]ut I also have never issued a dietary restriction that would limit any AIC to one meal per day." (Olive Decl. ¶ 12.) Notably, Fudge does not allege that Sgt. Olive or anyone else issued a dietary restriction limiting him to one meal a day. Rather, he alleges that Sgt. Olive refused to provide him with meals during Sgt. Olive's shifts as reprisal for the October 28, 2017, incident. Defendants present no evidence to demonstrate that Fudge received the allegedly missing meals, or that he was denied meals for some legitimate reason. Although Defendants note that AICs must "be fully dressed and standing near [his] cell doors" at mealtime to receive their meal, they do not assert that Sgt. Olive or others denied Fudge his meals because he was not fully dressed or not standing near his cell door.

The Court finds Fudge's allegation that he was denied somewhere between twenty-eight and thirty-six meals over a fourteen-to-eighteen-day period is "a sufficiently serious deprivation because food is one of life's basic necessities." *Foster*, 554 F.3d at 812-13 (finding a sufficiently serious deprivation of food in violation of the Eighth Amendment where the plaintiff was denied

sixteen meals in twenty-three days). Fudge does not allege that he suffered any specific injury or harm as a result of missing meals. *Cf. id.* at 813 n.2 ("Although food is a basic human need, the Eighth Amendment requires only that [an AIC] receive food that is adequate to maintain health[, and t]he record contains no evidence of the nutritional value of the prison meals or whether one meal could provide [the plaintiff] with sufficient calories and nutrients to sustain him for an entire day.") (simplified). Nevertheless, drawing all inferences in Fudge's favor, the Court finds that Fudge's allegation that missing two meals for several days resulted in a "crash diet" is sufficient to create a genuine dispute of material fact with respect to his deliberate indifference claim against Sgt. Olive. *See id.* (finding that "because all inferences must be drawn in [the plaintiff's] favor, it should be presumed that the meals [the plaintiff] was provided were inadequate to maintain health" where the plaintiff "alleged he lost weight . . . and suffered headaches and dizziness").

The Court finds that a reasonable juror could conclude that Sgt. Olive intentionally withheld meals from Fudge while he was in the DSU in retaliation for the October 28, 2017, incident, despite an obvious risk of danger to Fudge's health and safety. Further, the Court finds that Sgt. Olive is not entitled to qualified immunity for the alleged deprivation of meals. *See Foster*, 554 F.3d at 816 (finding the officer who denied the plaintiff meals was not entitled to qualified immunity because "[t]he decisions from this Circuit and others alerting prison officials of their obligations to provide inmates with nutritionally adequate meals on a regular basis should have given [the defendant] sufficient notice of the contours of the Eighth Amendment right"). Accordingly, the district judge should deny Defendants' motion for partial summary judgment with respect to Fudge's deliberate indifference claim against Sgt. Olive for the missed meals.

## VII.  SUMMARY

In summary, the Court recommends that the district judge grant in part Defendants' motion for partial summary judgment and enter summary judgment for the following defendants on Fudge's claims against them: Ofc. Armstrong, Ofc. Neal, Ofc. Hansen, Ofc. Moothart, Ofc. Carbajal, Sgt. Huston, Ofc. Ford, Ofc. Scott, Ofc. Lettunich, and Lt. King. The Court also recommends that the district judge enter summary judgment for Sgt. Olive on Fudge's excessive force claim and deliberate indifference claim related to the alleged deprivation of a decontamination shower, but deny Defendants' motion for partial summary judgment with respect to Fudge's deliberate indifference claim against Sgt. Olive related to the alleged deprivation of meals while Fudge was housed in the DSU.

If the district judge adopts the recommendations herein, Fudge's deliberate indifference claim against Sgt. Olive relating to the deprivation of meals, and Fudge's excessive force claim against the Response Team (Sgt. Bennett, Ofc. Buttram, Ofc. Brooks, Ofc. Johnson, Ofc. Rangel, Lt. Beaumont, Ofc. Cone, Ofc. Durham, Ofc. McNulty, and Ofc. Rodriguez) will proceed to trial.

## CONCLUSION

For the reasons stated, the Court recommends that the district judge GRANT in part and DENY in part Defendants' motion for partial summary judgment (ECF No. 107).

DATED this 9th day of September, 2022.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge